This is an appeal from a summary judgment in favor of the defendants, American Sterilizer Company ("the Company"), Donald J. Ryan, Keith Long, Kenneth D. Thomas, and Bill Roberts — all management members at the Company's Montgomery, Alabama, facility — and against Louis Stinson on Count II of his complaint, which alleged breach of an employment contract. The trial court made that judgment final pursuant to Rule 54(b), A.R.Civ.P. We affirm.
The issues presented for our review are whether the Company's employee handbook created an employment contract and, if so, whether that handbook required periodic performance evaluations for transferred employees. In essence, Stinson alleges that, because he did not receive periodic performance evaluations after his transfer and because his annual review was not timely submitted to him, prior to the termination of his employment, the defendants breached the contract based on the Company's employee handbook.
This case was filed after June 11, 1987; therefore, the applicable standard of review is the "substantial evidence" rule. See Ala. Code 1975, § 12-21-12. In West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989), this Court, construing § 12-21-12, stated that "substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." See Thomas v. Principal Mutual Financial Group,566 So.2d 735 (Ala. 1990).
Absent an agreement between Stinson and the Company requiring the Company to provide Stinson with periodic performance evaluations at specified intervals and with an annual review at a specific *Page 620 
time, Stinson had no cause of action for breach of an employment contract. Hoffman-La Roche, Inc. v. Campbell,512 So.2d 725 (Ala. 1987). Stinson argues that the Company's employee handbook created an employment contract upon which he was entitled to rely. Therefore, we must first address the issue of whether the Company's employee handbook did in fact create a contract of employment between Stinson and the Company and, if it did, whether the Company breached that contract by failing to provide Stinson with periodic performance evaluations at specified intervals and with an annual review at a specific time after he had been transferred to another job.
The Company's employee handbook introduces the employee to the Company and describes, along with other things, the benefits, employment conditions, and safety provisions. In the handbook, the Company expressly reserves the right to deviate from the policy provisions contained therein. That portion of the handbook styled "Summary" reads as follows:
 "This booklet has been prepared to give you a greater insight into the organizational practices and philosophy of the Company for which you work. This handbook will serve as a guideline for decision making. Although we strongly believe in consistency and uniformity, we will continue to practice flexibility and discretion in decisions
pertaining to the particular facts and circumstances. Because of the great variety of situations which may arise as well as fluctuating personnel needs, [the Company] reserves the right to make decisions related to employment in a manner other than as provided in this handbook. . . ."
(Emphasis added.)
In the handbook, the Company also reserves the right to deviate from its policies pertaining to discipline. After listing examples of inappropriate conduct — conduct that could result in immediate discharge — and after stating the procedures for the positive reinforcement and corrective action for such conduct, the handbook provides as follows:
 "Normally any appropriate action will be administered by the employee's immediate supervisor. Appropriate action will be determined based on such factors as severity, frequency, degree of deviation from expectations and length of time involved. Because of the great variety of situations which may arise, we may make decisions related to employment in a manner other than as provided in this section."
(Emphasis added.)
Furthermore, after listing the types of inappropriate conduct for which corrective action might be applied, the handbook informed its employees that the examples of conduct that could lead to progressive action techniques, up to and including discharge, were not all-inclusive:
 "The above listing should under no circumstances be considered to include all actions or conduct which may result in corrective action being appropriate. This listing has been established only to serve as examples of when progressive action techniques would normally be appropriate.
". . . .
 "The preceding listing [of examples of conduct which may result in immediate discharge] is by no means inclusive of all behavior that would be detrimental to our organization but it does help to remind us of some of the actions that would be counter to a harmonious work place."
(Emphasis added.)
In addition, the following portion of the performance review provision that Stinson relies upon is discretionary:
 "[A]s an employee who has just transferred to a new job, there are probably many questions yet unanswered. Because of this, your supervisor plans to hold several sessions with you during the early stages of your new job. These sessions are scheduled to be conducted on a 10-, 30-, 60-, and 90-day schedule following your job assignment. . . ."
It does not state that employees will or must be reviewed on a periodic basis after transfer. Rather, it simply states that supervisors *Page 621 
of transferred employees plan to hold several sessions with the employee during the early stages of his job.
Furthermore, although another portion of that provision mandates an annual review, it does not designate a specific date on which the Company must submit that review to the employee:
 "In addition, all employees will be reviewed on an annual basis by their supervisor to discuss their performance and the specific job responsibilities."
Although the Company did not review Stinson at each interval, it did conduct an annual review of his performance and it did provide him with a copy of that annual review prior to his termination, albeit several months after the annual review had been conducted.
In Hoffman-La Roche, supra, this Court, recognizing that the language in a policy contained in an employee manual may become an offer to create a binding unilateral contract, enunciated a three-pronged test in order to determine whether a policy contained in a handbook constitutes an offer to create a binding contract between an employer and an employee:
 "First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration."
512 So.2d at 735. However, whether a handbook policy meets this test is a matter of law to be determined by the court. SeeHoffman-La Roche, supra; see, also, Bailey v. Intergraph Corp.,537 So.2d 21 (Ala. 1988).
Under the facts in Hoffman-La Roche, the Court emphasized that the mandatory language in the disciplinary procedure in the handbook made no provision for deviation, reserved no discretion to the company, and contained no language stating that the list of inappropriate conduct was not all-inclusive. Furthermore, the Court in Hoffman-La Roche,512 So.2d at 734-35, noted the following:
 "[T]o become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy. . . . Indeed, if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook.
 "We do not find the indefinite nature of the time period for performance to be a bar to enforcement of a unilateral contract.
". . . .
 "Neither do we find that the possibility of enforcement of those specific policies set out in an employee handbook creates an unduly inflexible environment for the issuance of employment guidelines, rules, policies, or benefits. . . . [T]he unilateral offer made by the employer may be characterized. . . as follows: 'I promise I will not dismiss you without cause (or without exhausting specified procedures) unless I change this policy before you are discharged.' "
(Citations omitted.) (Emphasis added.)
Clearly, in the instant case, the language in the Company's handbook, taken in its entirety, is not sufficiently specific to constitute an offer of employment. Rather, the handbook expressly reserves the Company's discretion to follow, to ignore, or to unilaterally add to or change the reasons for discipline and to deviate from the policies entirely. Specifically, the closing remarks in the handbook clearly evince the employer's intent not to be bound by the terms of the disciplinary provision:
 "Because of the great variety of situations which may arise. . ., [the Company] reserves the right to make decisions related to employment in a manner other than as provided in this handbook."
In this case, the Company's employee handbook contains express disclaimers reserving the Company's right to deviate *Page 622 
from all the policies stated in that handbook. Stinson does not contest or dispute the existence of these disclaimers. Accordingly, Stinson could not reasonably conclude that the Company was committed to always adhere to the policy stated in the handbook; therefore, the handbook, as a matter of law, could not reasonably be construed as a unilateral contract of employment, modifying Stinson's employment-at-will status; the handbook, as a matter of law, could not be construed as constituting an enforceable contract of employment. Therefore, the trial court properly entered the summary judgment in favor of the defendants.
AFFIRMED.
HORNSBY, C.J., and SHORES and KENNEDY, JJ., concur.
JONES, J., concurs in the result.